EXHIBIT A

## JACKSON V. UNISYS CORPORATION
### CIV. A. NO. 08-3298 (E.D. Pa.)

### DEFENDANT'S PRIVILEGE LOG
#### June 5, 2009

| DATE | DESCRIPTION | STATUS | BASIS OF PRIVILEGE |
|---|---|---|---|
| Undated | Notes by Joseph Teklits | Withheld | Work Product |
| Undated | Timelines prepared by paralegal to assist in EEOC proceeding | Withheld | Work Product |
| Undated | E-mails to Tom Reiter, Lorraine Roskelly, and Carmon Harvey, Esq. concerning legal advice and work product | Redacted (D00322, D00327, D00329-33, D00335-39, D00342, D00344-47, D00349, D00352-53, D00355-56, D00358, D00360, D00367, D00385, D00446-47, D00450-51, D00453, D00455-57) | Attorney/Client Communication<br><br>Work Product |
| Undated | E-mail between Geri Devlin and Joseph Teklits, Esq. concerning legal advice | Withheld | Attorney/Client Communication |
| Undated | Note by Jack Hughson concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 9/20/04 | Three e-mails between Anita Bencivengo and James Zeris, Esq. concerning legal advice | Redacted (D00181) | Attorney/Client Communication |

| DATE | DESCRIPTION | STATUS | BASIS OF PRIVILEGE |
|---|---|---|---|
| 10/15/04 | E-mail between Anita Bencivengo and James Zeris, Esq. concerning legal advice | Redacted (D00181) | Attorney/Client Communication |
| 1/26/05 | Two e-mails between Kathryn Ruggieri and Joseph Teklits, Esq. concerning legal advice | Withheld | Attorney/Client Communication |
| 5/24/05 | E-mail between Kathryn Ruggieri and Joseph Teklits, Esq. concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 5/25/05 | Two e-mails among Kathryn Ruggieri, Joseph Teklits, Esq., Jack Hughson, and Philip Sinopoli concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 5/25/05 | Notes by Joseph Teklits | Withheld | Work Product |
| 5/26/05 | Four e-mails among Jack Hughson, John Nestoriak, Joseph Teklits, Esq., and Kathryn Ruggieri concerning legal advice | Withheld in part<br><br>Redacted in part (D00350) | Attorney/Client Communication<br><br>Work Product |
| 5/27/05 | E-mail between Joseph Teklits, Esq. and Kathryn Ruggieri concerning legal advice | Reacted (D00350) | Attorney/Client Communication<br><br>Work Product |
| 5/31/05 | Draft letter to Ray Jackson from Jack Hughson | Withheld | Work Product |
| 6/23/05 | Fax Cover Sheet between Linda Blimegger and Karen Bedy concerning legal advice and work product | Withheld | Work Product<br><br>Attorney/Client Communication |
| 6/28/05 | E-mail among Susan Dowd, Joseph Teklits, Esq., Jeannette Patey, John Nestoriak, and Brian McCleary concerning legal advice | Withheld | Attorney/Client Communication |

| DATE | DESCRIPTION | STATUS | BASIS OF PRIVILEGE |
|---|---|---|---|
| 6/29/05 | Two e-mails among Joseph Teklits, Esq., Geri Devlin, Susan Dowd, Jeannette Patey, John Nestoriak, Brian McCleary, and Jack Hughson concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/12/05 | E-mail between Joseph Teklits, Esq. Ron Gosdeck concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/16/05 | E-mail among Joseph Teklits, Esq., Linda Blimegger, and Jack Hughson concerning legal advice and work product | Redacted (D00559) | Attorney/Client Communication<br><br>Work Product |
| 7/18/05 | Four e-mails among Kathryn Ruggieri, Thomas Reiter, Virginia Clarke, Ron Gosdeck, and Joe Teklits, Esq., concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/19/05 | E-mails between Joseph Teklits, Esq. and Tom Reiter concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/20/05 | Nineteen e-mails among Thomas Reiter, Mark Danis, Ron Gosdeck, Kathryn Ruggieri, Virginia Clarke, Suzanne Geary, David Pingree, Claudia Langguth, and Joseph Teklits, Esq. concerning legal advice and work product | Withheld in part<br>Redacted in part (D00361, D00363-64, D00366) | Attorney/Client Communication<br><br>Work Product |
| 7/20/05 | Five e-mails between Joseph Teklits, Esq. and William J. Delaney, Esq. concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/21/05 | Two e-mails among between Susanne Geary, Tom Reiter, and Ron Gosdeck concerning work product | Withheld | Attorney/Client Communication<br><br>Work Product |

| DATE | DESCRIPTION | STATUS | BASIS OF PRIVILEGE |
|---|---|---|---|
| 7/22/05 | Five e-mails among Joe Teklits, Esq., Tom Reiter, Theresa Chung, Esq., and William Delaney, Esq. concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/25/05 | Three e-mails among Joseph Teklits, Esq., Linda Blimegger, Suzanne Geary, Tom Reiter, and Claudia Langguth concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/26/05 | E-mail between Joseph Teklits, Esq. and Tom Reiter concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 7/28/05 | Two e-mails among Joseph Teklits, Esq., Jeannette Patey, Jack Hughson, and Linda Blimegger concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 12/12/07 | Seven e-mails among Lorraine Roskelly, John Monaghan, Esq., Joseph Teklits, Esq., and Linda Blimegger concerning legal advice | Withheld | Attorney/Client Communication<br><br>Work Product |
| 12/14/07 | Two e-mails between Lorraine Roskelly, Diane Loebell, Esq., and John Monaghan, Esq. concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 12/18/07 | Four e-mails among Lorraine Roskelly, Diane Loebell, Esq., John Monaghan, and Thomas Reiter concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 12/19/07 | Seven e-mails among Lorraine Roskelly, Larry Muoio, John Monaghan, Esq., Diane Loebell, Esq., and Alan Kintisch, Esq. concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 12/20/07 | E-mail among Lorraine Roskelly, Larry Muoio, John Monaghan, Esq., and Diane Loebell, Esq. concerning legal advice and work product | Withheld | Attorney/Client Communication |

| DATE | DESCRIPTION | STATUS | BASIS OF PRIVILEGE |
|---|---|---|---|
| 1/21/08 | Seven e-mails among Lorraine Roskelly, Diane Loebell, Esq., Suzanne Geary, Jack Hughson, and Sherry Burkey concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 1/22/08 | Three e-mails among Lorraine Roskelly, Sherry Burkey, Jack Hughson, and Suzanne Geary concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 1/23/08 | Email between Lorraine Roskelly and Jack Hughson concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 1/24/08 | E-mail between Lorraine Roskelly and Diane Loebell, Esq. concerning legal advice and work product | Withheld | Attorney/Client Communication<br><br>Work Product |
| 1/28/08 | Draft Position Statement to EEOC | Withheld | Work Product |
| 12/11/08 | E-mail among Chris Rusek, Esq., Carmon Harvey, Esq., and Carolyn Ellis concerning legal advice and work product | Redacted (D00325) | Attorney/Client Communication<br><br>Work Product |

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAY JACKSON                    :
                               :
            Plaintiff,         :
                               :
    v.                         :   Civil Action No. 08-3298 (CDJ)
                               :
UNISYS CORPORATION,            :
                               :
            Defendant.         :
                               :

**DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST
SET OF INTERROGATORIES ADDRESSED TO DEFENDANT**

Defendant Unisys Corporation ("Unisys") hereby supplements its response to Plaintiff's

First Set of Interrogatories Addressed to Defendant ("Plaintiff's Interrogatories") as follows:

**GENERAL OBJECTIONS APPLICABLE TO
ALL INTERROGATORIES**

Unisys hereby incorporates all general objections set forth in its original responses to

Plaintiff's Requests.

**RESPONSES AND OBJECTIONS TO INTERROGATORIES**

1.    Describe in detail each and every reason why you decided to terminate Mr. Jackson's

employment with Unisys.

**RESPONSE:**

      Objection.  Unisys objects to Interrogatory No. 1 because it is overbroad and

burdensome.  Subject to and without waiver or limitation of the foregoing objections,

Unisys answers Interrogatory No. 1 as follows:

      *See Exhibits C, F, and G to Defendant's document production.*

2427462v5

**SUPPLEMENTAL RESPONSE:**

The employment records and employment-related communications contained in Exhibits C, F, and G to Defendant's document production provide details regarding the reasons why Jackson was separated from employment with Unisys and, subsequently, why Unisys did not consider Jackson for a potential new position with the company. As a result of Jackson's failure to meet his performance objectives, unreliability, and lack of responsiveness to employment-related requests by his managers, Unisys decided to lay off and terminate Jackson. Jackson was offered an agreement whereby he would voluntarily leave the company in exchange for severance beyond the standard U.S. severance benefit entitlement. This agreement dated May 31, 2005 and signed by Jackson has already been produced and speaks for itself. The company also considered the status of the group in which Jackson worked, including the future need for the position held by Jackson. Jackson's position with the company was not filled after his termination. Additional information regarding this response is contained in the documents previously produced, which documents speak for themselves.

2.      Identify the individuals who were involved in the decision to terminate Mr. Jackson's employment with Unisys, and for each such individual, describe in detail the role he or she played in the decision.

**RESPONSE:**

Objection. Unisys objects to Interrogatory No. 2 because it is overbroad and burdensome. Unisys further objects on the grounds that discovery is ongoing and Unisys does not have sufficient knowledge or information to fully answer this interrogatory at this time. Unisys further objects to the extent that the request seeks the disclosure of

- 2 -

information that is protected from disclosure by the attorney-client or other privilege, the

work product doctrine and/or the protection afforded mental impressions, conclusions,

opinions or legal theories of one or more attorneys and/or representatives of Unisys

concerning the litigation. Subject to and without waiver or limitation of the foregoing

objections, Unisys answers Interrogatory No. 2 as follows:

The following individuals were involved to varying degrees in the decision to

terminate Mr. Jackson's employment with Unisys: Plaintiff's manager Kathryn Ruggieri,

Plaintiff's former manager Virginia Clark, Vice President and HR Managing Business

Partner Jack Hughson, and counsel to Unisys.

## SUPPLEMENTAL RESPONSE:

Kathryn Ruggieri decided it would be in the best interests of Unisys if Jackson were

separated from employment with Unisys. Ruggieri consulted with Virginia Clark and Jack

Hughson. Hughson had a separation agreement prepared and presented it to Jackson.

Hughson and Ruggieri also consulted counsel.

Each of the individuals identified herein may be contacted through counsel for

Unisys.

3.    Describe in detail each and every reason why Mr. Jackson was not offered re-

employment with Unisys in July, 2005.

## RESPONSE:

Objection. Unisys objects to Interrogatory No. 3 because it is vague, overbroad and

burdensome. Subject to and without waiver or limitation of the foregoing objections,

Unisys answers Interrogatory No. 3 as follows:

*See* Exhibits C, F, G, H, I, and L to Defendant's document production.

## SUPPLEMENTAL RESPONSE:

*See* Supplemental Responses to Interrogatory No. 1. and Interrogatory No. 4. Also, the job for which Jackson expressed interest in July 2005 did not yet exist because it was dependent on Unisys winning a state government contract. Unisys did not obtain the contract and the job did not come into existence. Further, Unisys in this type of situation does not re-hire a former laid off employee unless such a re-hire has been approved by Human Resources. In addition, the potential re-hire of a person who has been laid off and received severance also involves a review of the employee's employment history at Unisys to ensure that they have acceptable prior performance and that their skills and competencies match the requirements of the position. Jackson's potential re-hire in July 2005 was not approved by HR, he did not possess an acceptable performance record at Unisys to be re-hired into this potential position in July 2005, he was never offered another position with Unisys in July 2005, and the potential position did not come into existence because Unisys did not obtain the state contract. Jackson had informal discussions with a Unisys manager, Claudia Langguth, about a potential opportunity that Unisys was bidding on, however, after speaking with HR and reviewing his performance record at Unisys, Langguth decided not to offer this potential position to Jackson in July 2005.

4.      Identify the individuals who were involved in the decision not to offer Mr. Jackson re-employment with Unisys, and for each such individual, describe in detail the role he or she played in the decision.

## RESPONSE:

Objection. Unisys objects to Interrogatory No. 4 because it is overbroad and burdensome. Unisys further objects on the grounds that discovery is ongoing and Unisys

- 4 -

does not have sufficient knowledge or information to fully answer this interrogatory at this time. Unisys further objects to the extent that the request seeks the disclosure of information that is protected from disclosure by the attorney-client or other privilege, the work product doctrine and/or the protection afforded mental impressions, conclusions, opinions or legal theories of one or more attorneys and/or representatives of Unisys concerning the litigation. Subject to and without waiver or limitation of the foregoing objections, Unisys answers Interrogatory No. 4 as follows:

The following individuals were involved to varying degrees in the decision to not to offer Mr. Jackson re-employment with Unisys: Kathryn Ruggieri, Virginia Clark, Ron Gosdeck, Claudia Langguth, Greg Baroni, and counsel to Unisys.

### SUPPLEMENTAL RESPONSE:

Upon learning in July 2005 that Jackson was being considered for a potential position with the Global Public Sector at Unisys, Ron Gosdeck, then a Vice President and HR Managing Business Partner for the Global Public Sector with Unisys, became involved regarding the potential rehire of Jackson. The potential position related to a bid that Unisys was submitting for a state contract. Gosdeck was aware from prior conversations with Ruggieri and Hughson that Jackson had performance problems at Unisys. Additionally, former employees who have been laid off and have received severance typically go through an HR approval process before being considered for rehire with the company. Gosdeck informed Greg Baroni, President of Unisys' Global Public Sector, that it was not in Unisys' best interests to consider any application Jackson might submit for the potential position in the Public Sector. Baroni agreed. Gosdeck also confirmed Jackson's performance issues with Ruggieri and Clark. Gosdeck, Ruggieri, and Clark thereafter had

a conversation with Langguth. After discussing with Gosdeck the HR approval process for

laid off employees and learning from Ruggieri and Clark that Jackson had a history of

performance issues, Langguth indicated that she no longer was interested in pursuing

Jackson for the potential position. Gosdeck then informed Jackson that Jackson would not

be considered for the potential position in July 2005.

Each of the individuals identified herein may be contacted through counsel for

Unisys.

5.      Describe in detail the factual bases for each and every affirmative defense you pled in

this lawsuit.

RESPONSE:

Objection. Unisys objects to Interrogatory No. 5 because it is overbroad and

burdensome. Subject to and without waiver or limitation of the foregoing objections,

Unisys answers Interrogatory No. 5 as follows:

It is premature at this point in the discovery phase of the case for Unisys to

"describe in detail" a factual basis for each of the affirmative defenses that it was required

by the Federal Rules of Civil procedure to plead with its Answer. The parties have not yet

taken the plaintiff's deposition and have not yet received any documents in response to

discovery requests in order to provide a "detail[ed]" factual basis for the assertion of each

affirmative defense. Unisys will supplement its response to this interrogatory in

accordance with the Federal Rules of Civil Procedure. *See generally* Defendant's document

production.

SUPPLEMENTAL RESPONSE:

*See* Supplemental Response to Document Request No. 13.

- 6 -

Dated: June 5, 2009

Edward T. Ellis (Pa. I.D. No. 26680)
Carmon M. Harvey (Pa. I.D. No. 91444)
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109
(215) 772-7322

*Attorneys for Defendant Unisys Corporation*

- 7 -

2427462v5

## CERTIFICATION

I, Ronald J. Gosdeck, am the Vice President, Global Recruiting of Unisys Corporation. As such, I am authorized to execute this Certification on behalf of Defendant Unisys Corporation. I have read the foregoing Responses to Interrogatories, and I know the content thereof. Said responses were prepared with the assistance and advice of counsel and employees of Unisys Corporation upon whose advice I have relied. The responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected, and thus far discovered in the course of the preparation of these responses. I and Defendant consequently reserve the right to make any changes if it appears at any time that omissions or errors have been made herein or that more accurate information is available. Subject to the limitations set forth herein, the said responses to the foregoing Interrogatories are true to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Dated: _June 4, 2009_          By: _____
                                         Ronald J. Gosdeck

## CERTIFICATE OF SERVICE

I, Carmon M. Harvey, hereby certify that on the date listed below I caused to be served a

true and correct copy of the foregoing Defendant's Supplemental Responses to Plaintiff's First

Set of Interrogatories Addressed to Defendant and Certification on the following person by U.S.

first-class mail:

Michael J. Salmanson
SALMANSON GOLDSHAW, P.C.
Two Penn Center
1500 J.F.K. Blvd., Suite 1230
Philadelphia, PA  19103
215-640-0593

*Attorney for Plaintiff*

Dated:  June 5, 2009

Carmon M. Harvey

242746.2v5

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RAY JACKSON                    : CIVIL ACTION
                               :
         vs.                   :
                               :
UNISYS, INC.                   : NO.  08-3298

- - -

January 27, 2010
Philadelphia, Pennsylvania

- - -

        Oral deposition of VIRGINIA CLARK,
taken in the offices of Montgomery, McCracken,
Walker & Rhoads, 123 South Broad Street,
on the above date, commencing at or about
10:00 a.m., before Janice M. Leaman, a
Notary Public and an Approved
Reporter of the United States District Court
For The Eastern District of Pennsylvania.

- - -

KAPLAN, LEAMAN & WOLFE
Registered Professional Reporters
325 Chestnut Street, Suite 909
Philadelphia, Pennsylvania 19106
(215) 922-7112

e3fee30f-ef1b-4e45-9abf-1c3e2dfd7c3c

Virginia Clark

45

1        A.    Not that I remember.

2        Q.    Do you remember whether you had to

3    formally give the approval through any sort of

4    on-line or electronic mechanism?

5        A.    I just really don't remember.

6        Q.    Okay.    Did a manager of his who was

7    recommending termination have to write any sort

8    of termination memo or other documentation to

9    justify the termination?

10       A.    I would think so, but I don't remember.

11       Q.    Do you recall whether you had any

12   conversations with Mr. Tecklitz about Mr.

13   Jackson?

14       A.    Yes.

15       Q.    Do you recall whether any of those

16   conversations occurred prior to Mr. Jackson's

17   separation from employment?

18       A.    Yes.

19       Q.    And do you recall how many conversations

20   you had with Mr. Tecklitz, prior to Mr.

21   Jackson's separation?

22       A.    Definitely one, maybe two.

23       Q.    Were those conversations just

24   one-on-ones with you and Mr. Tecklitz?

25       A.    I believe Sherry Burkey, the HR VP, was there, VP.

e3fee30f-ef1b-4e45-9abf-1c3e2dfd7c3c

Virginia Clark

46

1        Q.    And do you recall whether this was in a

2   formal meeting with Mr. Tecklitz and Miss

3   Burkey?

4        A.    It was.

5        Q.    Do you recall who called the meeting?

6        A.    Me.

7        Q.    And why did you call the meeting?

8        A.    Get advice.

9        Q.    Was this after Miss Ruggieri had

10  recommended Ray's termination?

11       A.    Before, way before.

12       Q.    Was this prior to you issuing the PIP?

13       A.    Yes.

14       Q.    It was in the context of developing the

15  PIP for Ray?

16       A.    Yes.

17       Q.    Have you issued PIP's to other employees

18  during your tenure at Unisys?

19       A.    Years and years ago.

20       Q.    Did you ask for Mr. Tecklitz'

21  participation in obtaining the advice?

22       A.    I don't understand that question.

23       Q.    Sure.    When you called the meeting, do

24  you recall whether you called the meeting with

25  Miss Burkey and Mr. Tecklitz attended, or did

e3fee30f-ef1b-4e45-8ebf-1c3e2dfd7c3c

Virginia Clark

47

1    you specifically ask for both of them to

2    attend?

3          A.    I specifically asked for both of them to attend.

4          Q.    And what was Miss Burkey's role?

5          A.    She was the HR business partner for HR.    HR for

6    HR, as we call it.

7          Q.    Her job responsibilities would be to

8    effectuate any HR changes within your

9    department?

10         A.    I don't know what effectuate means.

11         Q.    Okay.    That's such --

12               MR. ELLIS:    It's a lawyer's word.

13               THE WITNESS:    Remember, I'm blond.

14   BY MR. SALMANSON:

15         Q.    No, it's just a lawyer's word.

16               Was Miss Burkey the person

17   assigned to the HR department to assist in HR

18   -- because it's HR on HR, I'm trying to figure

19   out a way to articulate --

20         A.    Assisted on HR matters.

21         Q.    HR matters within the department?

22         A.    Yes.

23               MR. ELLIS:    She's the HR department for the HR

24   department.

25               THE WITNESS:    Yes.

e3fee30f-ef1b-4e45-8ebf-1c3e2dfd7c3c

Virginia Clark

48

```
 1        BY MR. SALMANSON:

 2        Q.    Right.    Now, is there a reason why you

 3   thought you needed Mr. Tecklitz' advice, in

 4   addition to Miss Burkey's?

 5        A.    I respect him, not that I didn't respect Sherry,

 6   but -- more experience.

 7        Q.    Is it fair -- go ahead?

 8        A.    Wanted to do the right thing.

 9        Q.    Were you concerned about any legal

10   ramifications related to putting Mr. Jackson on

11   a PIP?

12        A.    No.    I was concerned more about fair treatment,

13   precedence, employee relations, again, doing the right

14   thing.

15        Q.    Is it fair to say you were looking to

16   Mr. Tecklitz for practical advice rather than

17   legal advice?

18        A.    Absolutely, professional, professional advice.

19        Q.    And what do you recall Miss Burkey

20   telling you in developing the PIP?

21        A.    I am trying to remember.    See, because of my

22   background, I kind of -- you know, you have to be

23   specific, right?    So, be real specific in your --

24   identifying what behaviors you want to see, that he

25   didn't need to sign it for it to be operable.    Does that
```

e3fee30f-ef1b-4e45-8ebf-1c3e2dfd7c3c

Virginia Clark

49

1    make sense?    I don't even know if I am using that word

2    right.

3        Q.    Yes.

4        A.    Just trying to use a big word.    That's all I

5    really remember, to be honest.

6        Q.    Do you recall Mr. Tecklitz giving you

7    any different advice?

8        A.    Uh-huh.

9        Q.    That's a no?

10       A.    That was -- that's a no. That's a no.

11       Q.    Were there any discussions at that point

12   pertaining to whether termination was an option

13   at that time frame?

14       A.    So, is your question did we discuss terminating

15   Ray when I met with Sherry and Joe?

16       Q.    Yes.

17       A.    No, other than the standard PIP rule, which is if

18   you don't successfully complete the PIP, other measures

19   can be taken, up to and including termination, yes.

20   It's just standard language.    No, it was -- our

21   conversation where I was coming from on this was how do

22   you build success?    Again, taking into consideration my

23   background, my passion, it's about -- you don't put

24   people on these things to fire them.    You put people on

25   these PIP's to make them a success.    That's the mindset

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

e3fee30f-ef1b-4e45-9ebf-1c3e2dfd7c3c

EXHIBIT D

18feb10

1

1          (It is hereby stipulated and agreed by and

2   between counsel that, sealing, certification and filing

3   of the within deposition are hereby waived; that all

4   objections except as to the form of the question be

5   reserved until the time of trial.)

6          KATHRYN RUGGIERI, having been first duly

7   sworn, was examined and testified as follows:

8   BY MR. SALMANSON:

9       Q.    Ms. Ruggieri, as you know, my name is

10  Mike Salmanson and I represent Ray Jackson in a

11  lawsuit he's brought against Unisys.

12         Have you ever had your deposition

13  taken before?

14      A.    Yes.

15      Q.    So, you know the basic rules.    I will

16  ask you a set of questions, hopefully you will

17  be able to provide answers.    If I ask a

18  question that doesn't make sense to you, just

19  let me know.    I will try and rephrase the

20  question.    I think we may have something in

21  common in being fast talkers, and so, I think

22  you and I especially have to be careful about

23  not jumping on the end of each other's

24  sentences, because then Janice, even though

25  she's an extraordinary court reporter, can't

2

1   get everything down, and also it doesn't give

2   Mr. Ellis a chance to pose an objection if he

17 pattern into, or a pattern of medical events
18 specifically; correct?
19 A. It appears so here in this note, yes.
20 Q. And you weren't tying the -- at that
21 juncture the missed meetings or the missed
22 deadlines to medical events?
23 A. No.
24 Q. Did you have any discussions at any
25 point with Mr. Owens about the fact of the

62

1 medical events seem to be occurring around
2 deadlines?
3 A. No.
4 Q. Did you have a discussion with anyone
5 else in that regard?
6 A. No.
7 Q. Did you do anything in response to
8 receiving this memo from Mr. Owens?
9 A. I talked to Howard about his frustration.
10 Q. And what did Howard say to you?
11 A. I don't recall. It was centered around the
12 project that they needed to deliver.
13 Q. Did you have that discussion that day?
14 A. Oh, I don't remember.
15 Q. Do you recall having any discussions
16 with Mr. Tecklitz on or about the 26th of
17 January as a result of this memo?
18 A. I don't remember.
19 Q. Do you recall having any discussions
20 with Mr. Tecklitz in the end of January 2005,

18feb10

63

21   either by E mail or otherwise?

22       MR. ELLIS: I assume you mean about Ray

23   Jackson?

24       MR. SALMANSON: Yes.   About Ray Jackson.

25       THE WITNESS: I spoke to him about Ray Jackson

1   but I don't recall the time frame.

2   BY MR. SALMANSON:

3       Q.   And what was your purpose in speaking to

4   him about Mr. Jackson?

5       A.   That I had a performance concern.

6       Q.   Do you recall how many times you spoke

7   to Mr. Tecklitz --

8       A.   No.

9       Q.   -- about Mr. Jackson?

10           In response to -- do you recall E

11   mailing Mr. Tecklitz about the performance

12   concerns?

13       A.   No, I don't.

14       Q.   Now, Mr. Tecklitz was in the legal

15   department; correct?

16       A.   Correct.

17       Q.   Okay.   Was there a reason why you

18   addressed the performance concerns to Mr.

19   Tecklitz as opposed to people in HR?

20       A.   Well, I wouldn't share that with people in HR.

21       Q.   And why not?

22       A.   Because they would be peers, and that's

23   confidential information.

24       Q.   UU was part of the HR department;

25   correct?

Page 54

18feb10

1    A.   Yes.

2    Q.   Now, was there an HR representative

3 assigned to UU?

4    A.   There may have been.   There probably was, but I

5 don't remember who that person was.   It's --

6    Q.   Okay.   Is it fair to say that in

7 consulting with Mr. Tecklitz you weren't

8 seeking legal advice but more HR type advice,

9 and you went outside of HR to do that because

10 of the confidentiality concerns?

11    A.   I don't remember the -- I know it was to talk to

12 him about performance.   I just don't remember if there

13 was anything else.

14    Q.   As we sit here today, do you have any

15 recollection of seeking legal advice from Mr.

16 Tecklitz at the end of January, in regard to

17 Mr. Jackson?

18    A.   I don't know when that -- I don't know about the

19 time, I don't know if it was in January.

20    Q.   Okay.   And do you recall specifically

21 seeking advice of a legal nature from Mr.

22 Tecklitz as opposed to an HR issue?

23    MR. ELLIS: I object to the form of the

24 question.

25    THE WITNESS: At any time?

64

1 BY MR. SALMANSON:

2    Q.   Yes.

65

18feb10

3      A.   Yes.

4      Q.   When did you speak legal advice from Mr.

5   Tecklitz?

6      A.   I don't remember.

7      Q.   Was it in relation to Mr. Jackson's

8   termination?

9      A.   Consideration for termination, yes.

10     Q.   And were you considering terminating Mr.

11   Jackson as of the end of January?

12     A.   I don't remember.

13     Q.   If you, in fact, sent an E-mail to Mr.

14   Tecklitz on January 26th, the same day that Mr.

15   Owens wrote the E-mail, as you sit here today,

16   do you have any reason to believe that the

17   purpose of that E-mail was to solicit legal

18   advice from him?

19          MR. ELLIS: I object to the form of the

20   question.

21          THE WITNESS: I don't know.  I would have to

22   -- I mean --.

23          (Whereupon, an E-mail string, dated January

24   26, 2005, 11:59 a.m. was marked as Ruggieri Exhibit

25   Number 12, for identification. )

66

BY MR. SALMANSON:

1

2      Q.   I am showing you what's been marked as

3   Ruggieri 12.   I guess my first question is

4   does this help refresh your recollection that

5   at some point your title became director of

6   leadership learning and development?

7      A.   Yes.

18feb10

147

21    after the meeting in February telling him that

22    he was not being proactive in getting his

23    assignments finished?

24        A.    Specifically in terms of what I said to him

25    specifically?    I can't remember the words, no.

1        Q.    Well, generally did you talk about him

2    continuing to fail to take a proactive approach

3    after February?

4        A.    Yes.

5        Q.    With whom did you discuss, if anyone,

6    Mr. Jackson's potential termination prior to

7    the decision to terminate him?

8        A.    Virginia and Joe Tecklitz.

9        Q.    What do you recall --

10        A.    Excuse me, and Pat Bradford.

11        Q.    And what do you recall discussing with

12    Virginia?

13        A.    A layoff and how that would impact the university,

14    her feelings about it.

15        Q.    What was your purpose in discussing the

16    issue with Joe Tecklitz?

17        A.    Around the layoff, that there was a performance

18    component to this, but that we also had a requirement

19    from leadership to take costs out where we could.

20        Q.    Were you specifically seeking any legal

21    advice from Mr. Tecklitz?

22        A.    Yes.    He was head counsel.

23        Q.    But that doesn't necessarily mean he was

24    -- that you were seeking legal advice from him

25    as opposed to HR advice.

Page  126

18feb10

148

1          A.    Well, what do you mean by legal advice?

2          Q.    Sure.    I guess, the question is did you

3    think that there were any potential legal

4    issues that might arise out of Ray's

5    termination?

6          A.    No. I think that Ray had a history of being

7    closely connected with senior leadership, and I had

8    cleared that with Pat Bradford to make sure that it was

9    okay to remove this position, and she would be the

10   communication between me and Joe McGrath.    And once I

11   got clearance from that, I talked to Joe about the fact

12   that --

13          MR.  ELLIS: All right.    You are not supposed

14   -- you are not going to answer what you talked about?

15   Which Joe.    There's --

16          THE WITNESS: Joe Tecklitz.    You are right,

17   thank you.

18   BY MR.  SALMANSON:

19          Q.    Well, I want to be very clear.    Was

20   your discussion with Joe Tecklitz in terms of

21   justly the process for laying -- how the layoff

22   was effected, or again, were you seeking some

23   legal advice that you would need to review

24   before you effectuated a layoff?

25          A.    There was the component of performance and layoff

149

1    that I wanted to talk to him about.

2          Q.    And again, I'm trying to be very

Page 127

18feb10

3  particular in terms of you wanted to talk to
4  him because you were using him as a sounding
5  bore or because you thought there was a legal
6  component to the performance versus layoff
7  issue?
8      A.  Because there was a performance component could he
9  qualify for a layoff?
10     Q.  Okay.
11     A.  As opposed to a termination due to performance.
12     Q.  And that would be -- qualify for a
13  layoff within the meaning of the policies of
14  Unisys?
15     A.  That's right.
16     Q.  Mr. Teklits let's testified in
17  exercising the authority in Mr. Jackson's case
18  to characterize -- the question to him, I am
19  sorry, was, in exercising the authority in Mr.
20  Jackson's case to characterize his termination
21  as a layoff did you have discussions with
22  anyone to inform you or which played a factor
23  in your decision to characterize Mr. Jackson's
24  termination as a layoff?
25           Answer:yes.   Question:and who are

150

1  those individuals?      He answered, Catherine
2  Ruggieri."
3           Is that consistent with your
4  recollection?
5     A.  Yes.
6     Q.  Now, what do you recall specifically
7  discussing with Mr. Tecklitz in terms of

Page 128

18feb10

8    characterizing the termination as a layoff as

9    opposed to something else?

10         MR. ELLIS: She instructed not to answer.

11   12348 he waived the privilege.

12         MR. ELLIS: No, he didn't.

13         MR. SALMANSON: Sure he did.

14         MR. ELLIS: I don't think so.

15         MR. SALMANSON: In exercising the authority to

16   characterize as a layoff, did you have discussions with

17   anyone to inform you?   Who were those individuals?

18         MR. ELLIS: You asked him.

19         MR. SALMANSON: Catherine Ruggieri. The

20   substance.

21         MR. ELLIS: Who -- the fact that there was a

22   conversation isn't privileged.    I'm not going to let you

23   ask they are -- I'm not going to let her answer what the

24   content was of her conversation with Joe Tecklitz.

25         MR. SALMANSON: Well, he goes on, "do you

151

1    recall whether you had any discussions with Miss Ruggieri

2    where the particular topic was how to characterize Mr.

3    Jackson's termination?"

4         "Answer: Well, eventually there would have

5    been a conversation that discussed that to insure that

6    she agreed with that approach."

7         MR. ELLIS: Okay.

8         MR. SALMANSON: You don't think that's a

9    waiver of the privilege?

10        MR. ELLIS: No.

11        MR. SALMANSON: You are going to instruct her

18feb10

12  not to answer the question about what Mr. Tecklitz's
13  input from Miss Ruggieri was for Mr. Tecklitz to
14  determine that it should be characterized as a layoff?
15          MR. ELLIS: I'm not going to -- your question
16  is a little confusing but I don't -- I'm not going to let
17  the witness answer questions about the content of her
18  conversations with Joe Tecklitz.
19          MR. SALMANSON: Based on what?
20          MR. ELLIS: Attorney-client privilege.
21          MR. SALMANSON: He just testified there's not
22  a shred of evidence that she asked for legal advice from
23  Mr. Tecklitz.   This is not legal advice.
24          MR. ELLIS: The court will determine whether
25  she asked for legal advice.

152

1           MR. SALMANSON: No.  The Judge will determine
2  and it's your burden to prove that it's legal advice.
3          MR. ELLIS: Don't get excited. Mr. Salmanson.
4          MR. SALMANSON: I am getting excited.
5          MR. ELLIS: You know this is privileged.   If
6  you don't like my answer, go to the Judge.
7          MR. SALMANSON: It's not privileged.   January
8  26, '05, two E mails between Catherine Ruggieri and Joe
9  Tecklitz concerning legal advice.   She's already
10  testified earlier in this deposition that she did not
11  characterize communications in that time period as legal
12  advice.   May 25th, two E mails among Catherine Ruggieri,
13  Joe Tecklitz, Jack Hughson and Phillip Sinoffi concerning
14  legal advice, May 24th, E mail between Catherine Ruggieri
15  and Joe Tecklitz concerning legal advice.   I am asking
16  you on the record to review those three E mails and tell

Page 130

18feb10

17    me by the close of business today or first thing tomorrow

18    morning whether you are continuing to insist that those

19    are attorney-client privilege, because otherwise we have

20    to --

21            MR. ELLIS: I don't need to look at them. Go

22    to the Judge if you don't like my position.

23            MR. SALMANSON: You are saying that you are

24    not going to look at the E mails again in light of your

25    --

153

1            MR. ELLIS: I looked at the E mails. I

2    looked at the E mails when we put the E mails on the

3    list.

4            BY MR. SALMANSON:

5            Q.    Miss Ruggieri, prior to today, did

6    anyone ever ask you whether you solicited legal

7    advice from Mr. Tecklitz in regard to Mr.

8    Jackson?

9            MR. ELLIS: No, you are not going to answer

10    that question, either.   You are instructed not to

11    answer.

12            BY MR. SALMANSON:

13            Q.    Other than legal counsel, has anyone

14    ever asked you whether you sought legal advice

15    from Mr. Tecklitz in regard to Mr. Jackson's

16    termination?

17            MR. ELLIS: Has anybody -- wait a minute.

18    Before you answer that, has anybody asked you whether you

19    have sought legal advice from the lawyer other than the

20    lawyers?

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAY JACKSON                    :
                               :  CIVIL ACTION
          vs.                  :
                               :
UNISYS, INC.                   :  NO.  08-3298

                    - - -

          December 22, 2009
          Philadelphia, Pennsylvania

                    - - -

          Oral deposition of JOSEPH A. TEKLITS,
taken in the offices of Salmanson & Goldshaw,
Two Penn Center Plaza, 12th Floor
on the above date, commencing at or about
10:02 a.m., before Janice M. Leaman, a
Notary Public and an Approved
Reporter of the United States District Court
For The Eastern District of Pennsylvania.

                    - - -

          KAPLAN, LEAMAN & WOLFE
     Registered Professional Reporters
        325 Chestnut Street, Suite 909
      Philadelphia, Pennsylvania 19106
             (215)  922-7112

93fb8922-69b0-462e-8008-72b7b81608bc

Joseph Teklits

5

1        A.    The record will state whatever it says.    I don't

2  have any present recollection of that.

3        Q.    Do you recall, in fact, advising Mr.

4  Gosdeck that Mr. Jackson was applying for a new

5  position at Unisys?

6        A.    Yes.

7        Q.    And do you recall how you first learned

8  that Mr. Jackson was applying for a new

9  position at Unisys?

10       A.    Yes.

11       Q.    And how did you fist learn of that?

12       A.    Catherine Ruggieri called me and told me.

13       Q.    Do you know how Miss Ruggieri became

14  aware that Mr. Jackson was applying for a new

15  position?

16       A.    No.

17       Q.    Do you recall anything else Miss

18  Ruggieri told you in that phone call?

19       A.    No.

20       Q.    Do you recall Miss Ruggieri at any point

21  telling you that she didn't think that Mr.

22  Jackson should be re-employed by Unisys?

23       A.    No.

24       Q.    Do you recall discussing with anyone

25  other than Ms. Ruggieri and Mr. Gosdeck

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

93fb08922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

1    participated in the decision, it might be easier.

2            MR. SALMANSON: Okay.  Well, but I want to

3    make sure that there's nobody else who --

4            MR. ELLIS: But you can't ask him unless he

5    signed it.  I don't think he did, though?

6            MR. SALMANSON: Okay.

7    BY MR. SALMANSON:

8        Q.   Were you involved in any way in the

9    decision to terminate Mr. Jackson's employment

10   with Unisys?

11       A.   Yes.

12       Q.   And in what way?

13       A.   I was contacted by HR and asked for my legal

14   advice.

15       Q.   And who from HR contacted you?

16       A.   It would have been at least Kathleen -- Catherine

17   Ruggieri and Jack Hughson.

18       Q.   Do you typically get involved in

19   providing legal advice in regard to potential

20   layoffs?

21       A.   Yes.

22       Q.   To your knowledge, was there some

23   particular reason why Mr. Hughson and/or Miss

24   Ruggieri was seeking your legal advice in

25   regard to Mr. Jackson's termination?

7

93fb8922-69b0-462e-8008-72b77b81608bc

8

1          MR. ELLIS: I object to the form of the

2    question.

3    BY MR. SALMANSON:

4          Q.   You can answer, if you can.

5          A.   I can't answer the question.

6          Q.   Now, at some point you may get into

7    privileged conversations, and I don't know to

8    what extent you are willing to waive or not,

9    waive the privilege.   So I will ask the

10   question.   If Mr. Ellis is going to object and

11   invoke the privilege, I think that's the best

12   way we can proceed in that regard.

13          Do you recall the content of the

14   conversation with Miss Ruggieri in regard to

15   Mr. Jackson's termination?

16          A.   Yes.

17          Q.   As best as you can recall, what do you

18   recall the discussion being?

19          MR. ELLIS: I will object and instruct him not

20   to answer.

21          MR. SALMANSON: Okay.

22   BY MR. SALMANSON:

23          Q.   Do you recall the content of your

24   conversations with -- conversation with Mr.

25   Hughson in regard to the termination of Mr.

93fb8922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

1    Jackson?

2        A.    Yes.

3        Q.    And can you describe for me the content

4    of the conversation with Mr. Hughson?

5             MR. ELLIS: Well, can he is a yes-or-no

6    question.

7             MR. SALMANSON: Sorry.   Sorry.   Fair enough.

8             MR. ELLIS: If you want to provoke the

9    privilege --

10            MR. SALMANSON: Right.

11            MR. ELLIS: -- he's not going to discuss the

12   content of the conversation with you.

13            MR. SALMANSON: Okay.    I am trying to get the

14   privilege invoked.    So, fair enough.

15   BY MR. SALMANSON:

16       Q.    Is it fair to say that if -- well, let

17   me just ask the question.    Please describe for

18   me the conversation that you had with Mr.

19   Hughson?

20            MR. ELLIS: I object and instruct the witness

21   not to answer.

22   BY MR. SALMANSON:

23       Q.    Do you recall whether you had the

24   conversation -- a conversation jointly with Ms.

25   Ruggieri and Mr. Hughson or were they separate

93fb8922-69b0-462e-8008-72b77b81608bc

1    conversations, or some combination thereof?

2       A.   Some combination thereof.

3       Q.   Do you recall how many conversations you

4    had with Ms. Ruggieri regarding the potential

5    termination of Mr. Jackson's employment?

6       A.   I can only say there were many conversations.

7       Q.   Do you recall how many conversations you

8    had with Mr. Hughson regarding Mr. Jackson's

9    potential termination of employment?

10      A.   I would say three or four.

11      Q.   Do you recall whether you kept notes of

12   any or all of these conversations?

13      A.   I did.

14      Q.   And do you know whether those notes

15   still exist?

16      A.   Some of those notes still exist, in my file.

17      Q.   Do you recall the time frame during

18   which you had the multiple conversations with

19   Ms. Ruggieri?

20      A.   I believe they were for many months prior to Ray's

21   termination.

22      Q.   And do you recall the time frame during

23   which you were having conversations with Mr.

24   Hughson about Mr. Jackson's potential

25   termination?

93fb8922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

12

1          Q.    In the Answers to Interrogatories by

2     Unisys there's a similar question and answer

3     regarding the decision not to re-employ Mr.

4     Jackson.     The question is, "Identify the

5     individuals who were involved in the decision

6     not to offer Mr. Jackson reemployment with

7     Unisys, and from each such individual describe

8     in detail the role he or she played in the

9     decision."  The response states, in part, "The

10    following individuals were involved to varying

11    degrees in the decision to not offer Mr.

12    Jackson a reemployment with Unisys, Catherine

13    Ruggieri, Virginia Clark, Ron Gosdeck, Claudia

14    Langguth, Greg Barone and counsel to Unisys."

15               To what extent, if any, were you

16    involved in the decision not to re-employ Mr.

17    Jackson at Unisys?

18         A.    The only involvement I had was to call Ron Gosdeck

19    and tell him that Ray was applying for a position in his

20    organization.

21         Q.    And do you recall telling Mr. Gosdeck

22    that he should talk to Ms. Ruggieri and/or Miss

23    Clark about Mr. Jackson?

24         A.    That's simple company protocol.     I wouldn't have

25    to tell him that.

93fb8922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

14

1        A.   I did not.

2        Q.   Did you have any discussions with anyone

3   other than Mr. Gosdeck regarding whether Unisys

4   should re-employ Mr. Jackson?

5        A.   Well, I think I testified previously that

6   Catherine Ruggieri had called me and told me that Ray was

7   reapplying, but other than those two conversations,

8   that's the only conversations that I had.

9        Q.   Will you look at what's been marked as

10  P-8?   Could you turn to the document marked D

11  00388?   Do you recall that Mr. Jackson,

12  through counsel, made a request for his

13  personnel file?

14       A.   I have no independent recollection of that other

15  than looking at this exhibit.

16       Q.   Is it fair to say you have no

17  independent recollection of what steps you took

18  to make sure that his personnel file was

19  produced pursuant to his request?

20       A.   I don't understand your question.

21       Q.   Sure.   Do you recall what steps, if

22  any, you took to respond to the personnel file

23  request;   in other words, did you do it

24  yourself or did you delegate it to someone?

25       A.   No.   One of my paralegals would have done that.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

93fb8922-69b0-462e-8008-72b7b81608bc

1  employment, including but not limited to all

2  communications related to his proposed rehire

3  by Claudia Langguth."

4          Did you, in fact, put a litigation

5  hold on the documents described in my letter to

6  you?

7      A.   Yes.

8      Q.   And do you recall whether you

9  communicated to -- or to whom you communicated

10 the need to place a litigation hold on those

11 documents?

12     A.   I don't know each individual that I issued it to,

13 but typically my practice is to issue it to people who

14 have had some involvement in the underlying dispute.

15 So, it would have been Claudia, Ron, Catherine, and

16 perhaps Virginia.

17     Q.   And would you have issued that directive

18 in written form?

19     A.   Yes.   Typically that would come from one of our

20 paralegals.

21     Q.   And did you apply the litigation hold to

22 your own notes?

23     A.   Yes.

24     Q.   Do you know who made the decision to

25 characterize Mr. Jackson's termination as a

93fb8922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

17

1       layoff?

2       A.   I believe that would have been a joint decision.

3       Q.   And what's the basis to your belief?

4       A.   That's my recollection, that it was a decision

5       that was made between myself and Jack Hughson.

6       Q.   And do you recall the rationale for

7       making that decision with Mr. Hughson?

8            MR. ELLIS: I would think that might get into

9       legal advice.

10           MR. SALMANSON: I was just asking whether he

11      recalls the rationale.

12           MR. ELLIS: Okay.

13           MR. SALMANSON: I'm not asking for the

14      rational.

15           MR. ELLIS: Okay.

16           MR. SALMANSON: I think that's going to be the

17      next question that might evoke the privilege.

18      BY MR. SALMANSON:

19      Q.   Do you recall the rational for that

20      decision?

21      A.   Yes.

22      Q.   And what was the rational for that

23      decision?

24           MR. ELLIS: I object and instruct the witness

25      not to answer.

93fb88922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

18

```
 1          THE WITNESS: Can I confer with counsel?

 2      MR. ELLIS: Yes.    Sure.

 3      MR. SALMANSON: Sure.

 4          (Whereupon, an off-the-record discussion was

 5   held.)

 6          (Whereupon, the previous question was read by

 7   the court reporter.)

 8      MR. ELLIS: We are going to withdraw the

 9   objection to that question and Mr. Teklits will answer

10   that question.

11      MR. SALMANSON: Okay.

12      MR. ELLIS: Then we will see where we go from

13   there.

14   BY MR. SALMANSON:

15      Q.   Okay.

16      A.   The rational was to provide Ray with severance

17   benefits.

18      Q.   And under Unisys's then-existing

19   policies was an employee -- a terminated

20   employee only entitled to severance if he or

21   she were laid off?

22      A.   Yes.

23      Q.   And if Mr. Jackson had been terminated

24   for cause, is it correct that at the time he

25   would not have been eligible for severance?
```

93fb88922-69b0-462e-8008-72b77b81608bc

1              MR. SALMANSON: Let me try that again.      Fair

2    enough.

3    BY MR. SALMANSON:

4         Q.   In exercising the authority in Mr.

5    Jackson's case to characterize his termination

6    as a layoff did you have discussions with

7    anyone to inform you or which played a factor

8    in your decision to characterize Mr. Jackson's

9    termination as a layoff?

10        A.   Yes.

11        Q.   And who are those individuals?

12        A.   Catherine Ruggieri.

13        Q.   Do you recall whether you had any

14   discussions with Virginia Clark that led to

15   your decision to characterize Mr. Jackson's

16   termination as a layoff?

17        A.   I don't recall any.

18        Q.   And were the discussions with Miss

19   Ruggieri the same discussions to which you

20   described earlier?

21             Let me try that again: Were the

22   discussions with Miss Ruggieri to which you

23   just testified the same discussions that you

24   described earlier in your deposition?

25        A.   Do you mean when I said I had multiple discussions

93fb8922-69b0-462e-8008-72b77b81608bc

Joseph Teklits

21

1    -- many, many discussions with Catherine over a period of

2    months?

3         Q.    Yes.

4         A.    They would be included in those many, many

5    discussions.

6         Q.    Do you recall whether you had any

7    discussions with Miss Ruggieri where the

8    particular topic was how to characterize Mr.

9    Jackson's termination?

10              MR. ELLIS: You mean, a conversation in which

11   that was the only topic?

12              MR. SALMANSON: Or either the only topic or

13   among the topics that were discussed in a particular

14   conversation.

15              THE WITNESS: Well, eventually there would

16   have been a conversation that discussed that to insure

17   that she agreed with the approach.

18   BY MR. SALMANSON:

19        Q.    And do you recall having such a

20   discussion with Miss Ruggieri in that regard?

21        A.    Specifically, no.

22        Q.    Do you recall whether you maintained any

23   notes of conversations related to the topic of

24   how to characterize Mr. Jackson's termination?

25        A.    No.

93fb8922-69b0-462e-8008-72b77b8f608bc

EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAY JACKSON                    :   CIVIL ACTION
                               :
        vs.                    :
                               :
UNISYS, INC.                   :   NO.  08-3298

- - -

October 7, 2009
Philadelphia, Pennsylvania

- - -

Oral deposition of RON GOSDECK,
taken in the offices of Salmanson & Goldshaw,
Two Penn Center Plaza, 12th Floor
on the above date, commencing at or about
10:33 a.m., before Janice M. Leaman, a
Notary Public and an Approved
Reporter of the United States District Court
For The Eastern District of Pennsylvania.

- - -

KAPLAN, LEAMAN & WOLFE
Registered Professional Reporters
325 Chestnut Street, Suite 909
Philadelphia, Pennsylvania 19106
(215)  922-7112

Ron Gosdeck

8

1    learned that Mr. Jackson was interested in

2    being re-employed by Unisys in the summer of

3    2005?

4         A.   I was advised by Joe Teklits that Ray had applied

5    for a position.

6         Q.   Did Mr. Teklits inform you how he became

7    aware of that situation?

8         A.   I don't recall.

9         Q.   And Mr. Teklits is counsel for Unisys?

10        A.   Correct.

11        Q.   And what do you recall Mr. Teklits

12   telling you at the time?

13        A.   As I recall, he was merely advising me that Ray

14   was applying for a position, and that I should probably

15   talk to his current manager before we proceeded with any

16   type of a hire.

17        Q.   Anything else that you can recall Mr.

18   Teklits telling you in that conversation?

19        A.   No.

20        Q.   Did Mr. Teklits inform you how he became

21   aware that Mr. Jackson was applying for a new

22   position?

23        A.   I don't believe so.

24        Q.   What is your current position at Unisys?

25        A.   Current position is vice president of global

42732072-b613-4fcb-85cd-64b2afcf811c

Ron Gosdeck

25

1    want to look at hiring Ray and we may not want

2    to do that?

3    A.    We may   --   we want to look at not   --   let me   --

4    Q.    Okay.    I may have misheard you, but

5    that's why I was asking, because it seemed

6    inconsistent?

7    A.    Clarity is good.

8    Q.    I don't think you   --

9    A.    The discussion would have been around our desire

10   not to hire Ray Jackson; how is that?

11   Q.    Okay.    Fair enough.    And was that

12   based on any independent views you had as to

13   Mr. Jackson's performance?

14   A.    No, because I would not have had a view to Mr.

15   Jackson's performance.    He didn't work in my

16   organization and I had no access to that data.

17   Q.    How did you first become aware that Mr.

18   Jackson had had performance issues prior to his

19   layoff?

20   A.    From a conversation with Catherine Ruggieri and

21   Virginia Clark.

22   Q.    And do you know how that conversation

23   was initiated?

24   A.    When Joe Teklits advised me that we might want to

25   look at the fact that Ray was applying go for a job in

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

42732072-b613-4fcb-85cd-64b2afcf811c

Ron Gosdeck

26

1   public sector and should talk to his prior management.

2      Q.   Do you have an understanding of how far

3   along the requisition process for the position

4   that Mr. Jackson wanted to fill got?

5      A.   It's my understanding that the requisition was

6   entered in the system, but never approved.

7      Q.   And when a requisition is opened or

8   entered in the system it's not tied to a

9   particular individual; correct?

10     A.   Correct.

11     Q.   Do you know whether, in fact, an

12   individual was hired to fill the role that Mr.

13   Jackson was looking to fill, either through

14   that requisition, or any other?

15     A.   I do not.

16     Q.   How long does it typically take, if

17   there is a typical time period, between the

18   time a requisition is entered and it being

19   ultimately approved?

20     A.   There is no easy answer for that question.

21     Q.   I had a feeling there wasn't.

22        Does it depend on how quickly the

23   position needs to be filled?

24     A.   It depends on a variety of factors, the difficulty

25   of the position, it could be that a manager says to the

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

42732072-b613-4fcb-85cd-64b2afc8f11c